1  Dave Carothers, Esq. – SBN: 125536
TREMBLAY BECK LAW, APC
2  5330 CARROLL CANYON ROAD
SUITE 230
3  San Diego, California 92121
Telephone: (858) 792-7492
4  Facsimile: (858) 792-7768
dave@tremblaybecklaw.com

5

6  Attorneys for Plaintiffs Shantilese Daniel and Otis Evans

7

8  **UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| Shantilese Daniels, an individual; Otis Evans, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO, a public entity; Nick Macchione, an individual; Kimberly Giardina, an individual; Melissa Sawyer, an individual; DOE HHSA Workers 210, known but unidentified individuals; and DOES 1 through 20, inclusive.<br><br>Defendants. | **'23CV0316 BAS BGS**<br><br>**COMPLAINT FOR DAMAGES**<br><br>Claim 1:  42 U.S.C. §1983 (Unwarranted Seizure)<br><br>Claim 2:  42 U.S.C. §1983 (Coerced/Unwarranted Medical Exams and Procedures)<br><br>Claim 3:  42 U.S.C. §1983 (Judicial Deception, Unnecessary/Excessive Duration of Continued Detention)<br><br>Claim 4:  *Monell*-Related Claims<br><br>  – Count One (Unwarranted Seizures)<br><br>  – Count Two (Unwarranted Medical Exam/Procedures)<br><br>  – Count Three (Judicial Deception)<br><br>**JURY TRIAL DEMANDED** |

## Jurisdiction and Venue

1.      This action is brought pursuant to 42 U.S.C. §1983 to seek redress for Defendants' actions taken under color of law which violated Plaintiffs' rights under the United States Constitution. Defendants' conduct deprived Plaintiffs of their fundamental constitutional rights secured under the United States Constitution's First and Fourteenth Amendments, and under federal law.

2.      Jurisdiction is conferred by 28 U.S.C. §§1343(a)(3) and 1343(a)(4), which provides for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. §1983. Jurisdiction is also conferred by 28 U.S.C. §1331 because the claims for relief derive from the United States Constitution and the laws of the United States.

3.      The acts and omissions complained of herein occurred in the County of San Diego, and it is believed that all living Defendants currently reside in the County of San Diego. Venue is proper in the District Court for the Southern District of California.

4.      Plaintiff makes the following allegations and claims upon personal knowledge and belief, investigation of their counsel, and on information and belief.

## The Parties

5.      At all times relevant to this Complaint, Plaintiffs Shantilese Daniels and Otis Evans, were residents of San Diego County, California. Shantilese is Baby S.'s mother and Otis is her father.

6.      Defendant County of San Diego ("County") is a public entity of which the San Diego County Health and Human Services Agency ("HHSA") is a subdivision.

7.      At all times relevant to this Complaint, HHSA Worker Nick Macchione( "Macchione") was an individual residing in the County of San Diego, and an officer, agent, and/or employee of the County of San Diego and HHSA. At all relevant times alleged herein, she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Diego in doing the things alleged herein.

8.     At all times relevant to this Complaint, HHSA Worker Kimberly Giardino ("Giardino") was an individual residing in the County of San Diego, and an officer, agent, and/or employee of the County of San Diego and HHSA. At all relevant times alleged herein, she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Diego in doing the things alleged herein.

9.     At all times relevant to this Complaint, HHSA Worker Milissa Sawyer("Sawyer") was an individual residing in the County of San Diego, and an officer, agent, and/or employee of the County of San Diego and HHSA. At all relevant times alleged herein, Defendant Giarina was HHSA Worker Sawyers's supervisor. At all relevant times she was acting within the course and scope of her duties, under color of law, and pursuant to the regularly established customs, policies, and practices of the County of San Diego in doing the things alleged herein.

10.     At all times relevant to this Complaint, DOE HHSA Workers 2 - 10 were individuals residing in the County of San Diego, and officers, agents, and/or employees of the County of San Diego and HHSA acting within the course and scope of their duties, under color of law, and pursuant to the regularly established customs, practices, and policies of the County of San Diego in doing the things herein alleged. Plaintiff is ignorant of the true names and capacities of those DOE HHSA Worker Defendants sued herein as DOE HHSA Workers 2 - 10, and for that reason has sued such Defendants under such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to identify the DOE HHSA Worker Defendants when their identities have been ascertained. Each of the fictitiously named DOE HHSA Worker Defendants was in some manner liable and legally responsible for the harms sustained by Plaintiff in that their conduct caused the damages and injuries set forth herein.

11.     Hereinafter, when referred to collectively, the Defendants in paragraphs 7 through 11, inclusive, may occasionally be referred to as the HHSA DEFENDANTS.

12.    Plaintiffs are ignorant of the true names and capacities of those Defendants sued herein as Defendant DOES 1 through 20, and for that reason have sued such Defendants under such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to identify the DOE Defendants when their identities have been ascertained. Each of the fictitiously named DOE Defendants was in some manner liable and legally responsible for the harms sustained by Plaintiffs in that their conduct caused the damages and injuries set forth herein.

13.    Whenever this Complaint makes reference to any act of "Defendants," such allegations shall be deemed to mean all named Defendants, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, who did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants (or any of them) and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

14.    At all times relevant to this Complaint, Defendants, and each of them including all DOE Defendants, were the knowing agents and/or alter egos of one another. Defendants directed, ratified, and/or approved each other's conduct and that of each other's agents or employees. Defendants, and each of them including all DOE Defendants, agreed upon, approved or ratified each other's conduct, or otherwise conspired together to commit all of the acts and/or omissions alleged herein.

15.    The HHSA Defendants, and each of them, were at all relevant times acting within the course and scope of their duties as employees of the County of San Diego.

16.    The HHSA Defendants, and each of them, were at all relevant times acting in conformance with the regularly established customs and practices of the County of San Diego.

17.    The HHSA Defendants, and each of them, were at all relevant times acting under color of law.

**Summary of Allegations**

18.    On or about December 9, 2021, Child Welfare Services received a referral and, on information and belief, and immediately opened an investigation of Ms. Shantilese Daniels and Mr. Otis Evans. Both were accused of neglect and physical abuse of Baby S. In fact, Ms. Daniels had taken Baby S from Ms. Daniels and Mr. Otis. In fact it was Ms. Daniels who pointed out to the doctor a very small discoloration on the bottom of Baby S' foot. Both parents were informed that Baby S was to be removed from their home. There was no explanation or basis for removing Baby S from their home. On January 18, 2022, Child Welfare Services sent a letter by mail to Ms. Shantilese Daniels and Mr. Otis Evans that as of that date (i.e. January 18, 2022) the investigation was "closed". See Letter dated January 18, 2022 from Melissa Sawyer, PSW on County of San Diego, Health and Human Services Agency, Child Welfare Services letterhead attached hereto as

## COMMON ALLEGATIONS

19.    Ms. Daniels and Mr. Evans are both County residents. They have three children. They are African American.  As a family, they were severely mistreated by the conduct perpetrated by county social worker, Melissa Sawyer, resulting in various violations of their civil rights and are now suffering from severe emotional distress.

20.    Ms. Daniels works as a manager for a well-known coffee chain. Her significant other, Otis Evans, have been together for 17 years. They has three children, ages 14, 11 and Baby S., 2 months old at the time of the incident. At the time of the events described below, Mrs. Daniels was still breast feeding two-month-old Baby S. Neither Mrs. Daniels nor Mr. Evans has any prior CWS history.

21.    On Monday, December 6, 2021, as Ms. Daniels was bathing baby Baby S., she noticed two very small red "spots" on the bottom of Baby S.'s right foot. Other than the two red spots on the bottom of Baby S.'s right foot, he was his typical smiling, happy and energetic self as his mom got him ready for the day. While concerned about the two red spots, Ms. Daniels noted mentally that she and the baby had an appointment with the pediatrician the next day, December 7, 2021, and would bring it to the doctor's attention.

22.     The next day on Tuesday, December 7, Mrs. Daniels kept the appointment at Rady's Children. The pediatrician, Saadia Irem Khan, M.D. ("Dr. Khan"), conducted a complete physical examination and deemed Baby S. healthy until Ms. Daniels, at the end of the appointment, remembered the two red dots on the bottom of Baby S.'s right foot and highlighted it for the doctor. The Dr. Khan had failed to notice it during her examination. But for Ms. Daniel pointing it out, would have passed on it. Upon reexamining Baby S., Dr. Khan noted she was unfamiliar with the two red dots, stating she had not observed anything like it before. Dr. Khan took a picture of the bottom of Baby S.'s right foot and informed Ms. Daniels she would refer the pictures to Dermatology.

23.     On December 8, Wednesday, having heard nothing from Dr. Khan, Ms. Daniels called and left a message for the doctor. Dr. Khan called back and said she had been extremely busy but reiterated that she would go ahead and send the picture she took the day before to Dermatology.

24.     On December 9, Thursday, Dr. Khan called and asked Ms. Daniels, "Did Baby S. kick something with her right foot that caused injury." Ms. Daniels responded, "No." Ms. Daniels also inquired about the results of the blood workup. The doctor responded with a puzzling statement, "I will be doing an investigation, and someone will be in contact with you." However, the doctor never informed Mrs. Daniels what she, the doctor, concluded about the two red dots at the bottom of Baby S.'s right foot or any other concerns she had as a doctor after examining Baby S.

25.     On December 10, Friday, about mid-morning, a caseworker by the name of Melissa Sawyer, PSW ("Sawyer") was at Ms. Daniels' door, asking for entry. Sawyer informed Ms. Daniels that she had just left the school where Ms. Daniels' older kids attended and questioned them. Sawyer then began physically examining baby Baby S.! ***Sawyer then stated that the Pediatrician's report did not match the physical examination Sawyer had just conducted on the baby at Ms. Daniels home.*** Apparently, the "pediatrician's report" detailed that when she saw baby Baby S. back on December 7, there was a bruise "on her face and bruises between his toes and bottom of her foot.

Sawyer stated verbally before Ms. Daniels that she saw nothing corroborating what the pediatrician described. In fact, the "two red dots" that were seen on the bottom of baby Baby S.'s right foot were no longer there. Sawyer confirmed that a suspected "bruise" was simply a birthmark and confirmed there were no "bruises" between the baby's toes.

26.    Notwithstanding the aforementioned physical findings, Sawyer excused herself to call her supervisor. At the conclusion of that call, Ms. Daniels was told to cancel everything for the day and to accompany Sawyer to Rady's hospital for baby Baby S. to be examined yet again. Ms. Daniels arrived at Rady's at 1 p.m. and could not leave until 8:30 that night. At the conclusion of what started out already as a nightmarish day, Ms. Daniels was being charged with allegations that Baby S., when presented to Dr. Khan on December 7, had bruising and an "inflicted injury". Ms. Daniels was told that the baby could not return home with her and that she could never be alone with her baby again. The only accommodation that would be permitted was having a family member come and pick up the baby from the hospital. Ms. Daniels was spent, overwhelmed, confused and emotionally distraught. A good number of friends and family members, who had arrived at hospital, attempted to console Ms. Daniels. It was useless: her two-month-old baby had just been taken from her and everyone there observed that her pain was palpable. Immediately, the nursing and bonding she experienced with Baby S. was cutoff. Her time with baby was restricted to traveling to a relative's house, feeding her baby and then having to promptly leave. She and the family were ordered that she could never be alone with Baby S. An order that carries with it the inference that Ms. Daniels was an unfit mother, causing further shame, guilt, humiliation, and fear among other things. The experience was a waking nightmare.

27.    On December 20, Sawyer called Ms. Daniels to say that the "doctor" had concluded that the "bruise" was an "inflicted injury" and that the order was that she still could not have her baby returned to her. The nightmare continued.

28.    There can be no debate the emotional toll this has taken on Ms. Daniel's psyche and impact on her, her ability to be a mother to her other children, and the extreme

emotional toll she suffered as a nursing mother. Ms. Daniels in her grief and pain followed every direction by CPS. On January 18, 2022, Mr. Evans and Ms. Daniels were informed by a form letter from Sawyer that "After conducting an investigation, we have concluded that this referral may be closed effective January 18, 2022." No findings of the "investigation" were ever shared with Mr. Evans or Ms. Daniels. This cursory ending to the very dramatic and unsupported taking of her child with the additional allegations that the baby was bruised and suffering from an 'inflicted injury' only made their emotional pain worse.

29.     Obviously, there was no real investigation. Any "investigation" was an after the fact to cover up of what was clearly an attempt by the County and CPS to cover themselves. The Defendants took undue liberties with this Black family. During this agonizing process, Ms. Daniels pleaded to have an African American pediatrician brought in as part of the County's processes. Her request was wholly ignored.

30.     The National Association of Social Workers (NASW), in 2021, noted in its own report, "Undoing Racism Through Social Work: NASW Report to the Profession on Racial Justice Priorities and Action noted:

> "As our nation turns more attention to addressing its long history of systemic racism, the National Association of Social Workers acknowledges that our profession has not always lived up to its mission of pursuing social justice for all. We apologize for supporting policies and activities that harm people of color and we will strengthen our efforts to end racism in the social work profession and in society."

It went further to add:

> "Bias among social work professionals negatively influences health care, mental health and social service delivery for people of color. One of the most persistent challenges to anti-racist practice within social work is the disproportionate impact of the child welfare system on families of color. Research shows that African American, Latino/Hispanic and Native

COMPLAINT FOR DAMAGES

American children are still less likely to receive social support services, **but more likely to be removed from their homes during interactions with the child protection system**." (citations omitted)

31. The County ran roughshod over this family and exhibited a callous disregard for the wellbeing of this couple's family. They reached certain conclusions based on the family's race and not on the evidence. How does a PSW go from observing the baby on December 10, and concluding that she saw nothing consistent with the "report" of the doctor and later jumping to the allegation that the baby suffered "serious injury" and Ms. Daniels and Mr. Evans were now a "threat and danger to Baby S.'s safety"?

32. The County and the social worker violated Ms. Daniels' and Mr. Evans' civil rights as guaranteed by the California and U.S. Constitutions, 42 U.S.C. 1983 and causing extreme emotional distress. We are aware of other Black families who have raised similar issues. Ms. Daniels and Mr. Evans seek recovery for their severe emotional distress and recovery of attorney's fees. The extreme mental suffering and pain suffered by them both throughout this process, which had no evidentiary support, must be addressed and acknowledged by the County of San Diego and CPS.

## FIRST CLAIM FOR RELIEF (42 U.S.C. §1983)

### *Violation of Plaintiffs' Rights to Substantive and Procedural Due Process in the Seizure of C.H*

(By Plaintiffs Shantilese Daniels and Otis Evans Against Defendants
Macchione, Girardina, DOE HHSA Workers 2 - 10,
and DOES 1 through 20, inclusive)

33. Plaintiffs reallege, and to the extent applicable, incorporate herein each of the foregoing allegations as if set forth herein in full.

34. At all times relevant herein, the right to familial association guaranteed under the First and Fourteenth Amendments to the United States Constitution was clearly established, such that any reasonable "child welfare" services agent in Defendants' position and circumstances, as alleged above, would have known that it was unlawful to

seize Baby S. from the care, custody, and control of Plaintiffs without first obtaining a warrant.

35.     When Defendants first received the hotline referral regarding Baby S., they refrained from undertaking a reasonable investigation prior to making the decision to seize Baby S. from Plaintiffs' care. Moreover, at the time these Defendants, and each of them, made the decision to seize Baby S. from his parents' care they knowingly refrained from even considering lesser intrusive alternative means of ameliorating any perceived danger to Baby S. In fact, at the time these Defendants seized Baby S., there was no evidence in Defendants' possession to suggest that Baby S. was in immediate danger of suffering severe injury or death at the hands of either of his parents in the short time it would have taken to obtain a court order.

36.     Nonetheless, these Defendants, and each of them seized Baby S. without a warrant or other similar court order, under non-exigent circumstances, over Plaintiffs' strenuous objections – all in violation of Plaintiffs' rights arising under the United States Constitution's Fourteenth Amendment.

37.     These Defendants, and each of them, were at all times acting under color of state law when they seized Baby S. from Plaintiffs' care, custody, and/or control without a warrant when there was no legal or legitimate basis to do so.

38.     Prior to Baby S.'s unwarranted seizure, these Defendants, and each of them discussed the proposed unwarranted seizure. As a result of that discussion, each Defendant knew or should have known all facts relevant to their joint decision to forego warrant requirements, including the fact that the child was not under imminent threat of serious bodily harm at the hands of his parents. Moreover, these Defendants, and each of them, knew definitively that Baby S. was in no danger of suffering severe bodily injury or death in the short time it would have taken for them to obtain a warrant. Nonetheless, these Defendants, and each of them, agreed and/or approved of the decision to forgo obtaining judicial authorization prior to seizing Baby S. from Plaintiffs' care, custody, and/or control.

39.     As a direct and proximate consequence of the aforementioned conduct, Plaintiffs have suffered, and will continue to suffer, damages, including but not limited to economic injury, physical and/or mental anxiety and anguish and emotional distress according to proof at trial.

40.     In doing the things alleged herein above, these Defendants, and each of them, acted intentionally and/or with a conscious disregard for Plaintiffs' constitutional rights. As a result of the intentional and willful conduct of these defendants in effectuating the knowing and wanton violation of Plaintiffs' constitutional rights, Plaintiffs are entitled to recover punitive damages against these individual defendants in an amount according to proof at trial.

## SECOND CLAIM FOR RELIEF (42 USC §1983)

### *Non-Consensual Unwarranted Medical Examinations and Medical Procedures,*

(By All Plaintiffs Against Defendants Giardina and Sawyer, DOE HHSA Workers 2 - 10, and DOES

1 through 20, inclusive)

41.     Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

42.     At all relevant times, the constitutional right to remain free of non-consensual intrusive medical examinations and to make decisions regarding the medical care of one's child has been so "clearly established" that any reasonable HHSA worker in Defendants' circumstances would know that it is a violation of Plaintiffs' constitutional rights to subject their child to a forensic medical examination without just cause, parental consent, or a court order/warrant authorizing the examination. *See*, *Swartwood v. County of San Diego*, 2014 U.S. Dist. LEXIS 182020, *58-59 (S.D. Cal. Sept. 30, 2014) "[T]he Constitution assures parents, in the absence of parental consent, physical examinations of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to

be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances."]; *see also*, *Mann v. Cty. of San Diego*, 907 F.3d 1154, 1163 (9th Cir. 2018).

43.     These Defendants, and each of them, violated said rights first when they directed that such an unwarranted forensic/investigational medical examination be performed without first obtaining a warrant or knowing and voluntary parental consent; then again when they excluded Shantilese from Baby S.'s follow-up medical examination on July 9, 2020, without any just or legal cause.

44.     In addition to the foregoing, parents also have a guaranteed constitutional right arising from the liberty interest in family association to be with their children while they are receiving medical attention or undergoing medical procedures. *Wallis ex rel. Wallis v.* Spencer, 202 F.3d 1126, 1141-1142 (9th Cir. 1999)*.* This right includes the right of parents to make important medical decisions for their children. *Id.* at 1141.

45.     No reasonable HHSA agent in these Defendants' position could have believed that the above-mentioned conduct was lawful or even abstractly justifiable. In fact, it was not.

46.     These Defendants, and each of them, had an affirmative duty and obligation to recognize, acknowledge, and respect Plaintiffs' constitutional rights and to conduct themselves in a manner that confirms to, provides for the preservation of, and does not violate those rights. These rights include, without limitation, the right to privacy, family integrity and the right to remain free of non-consensual unwarranted forensic medical examinations, the right to be present at such examinations absent an affirmative showing of good cause for exclusion, the right to control and participate in medical decisions relative to their children – all arising under the First and Fourteenth Amendments to the United States Constitution.

47.     These Defendants, and each of them, were acting under color of state law when they jointly acted, agreed, and/or conspired to violate Plaintiffs' constitutional rights

by, but not limited to, the performance of unwarranted and non-consensual medical examinations and procedures on Plaintiffs' child as described herein above.

48.    As a direct and proximate consequence of said misconduct, Plaintiffs have suffered, and will continue to suffer economic damages as well as but not limited to physical and/or mental anxiety and anguish and other emotional injury according to proof at trial.

49.    In doing the things alleged herein, these Defendants, and each of them, acted intentionally and/or with a conscious and callous disregard for Plaintiffs' constitutional rights. As a result, Plaintiffs are entitled to recover punitive damages against these individual Defendants, and each of them, according to proof at trial.

## THIRD CLAIM FOR RELIEF (42 USC §1983)

### *Deception in Creation and/or Presentation of Evidence/False Reporting*

(By All Plaintiffs Against Defendants Macchione, Giardina, Sawyer,

DOE HHSA Workers 2 - 10, and DOES 1 through 20, inclusive)

50.    Plaintiff incorporates the above allegations of fact and law as though fully set forth herein.

51.    The right to familial association guaranteed under the Constitution's Fourteenth Amendment is so "clearly established" such that any reasonable HHSA worker and/or child abuse investigator, or other governmental agent, or person acting in an investigatory capacity – including these Defendants, and each of them, would know it is unlawful to continue to detain a child from the care, custody and control of its parents based on knowingly false, and/or based on a juvenile court order which the particular Defendant fraudulently obtained, or caused to be fraudulently obtained.

52.    Plaintiffs are further informed and believe and thereon allege that the right of a parent to remain free of the government's fraudulent creation and/or presentation of false, misleading, and/or deceptive, and/or suppressed material exculpatory evidence in juvenile court proceedings is so clearly established that any government agent or person acting in an investigatory capacity faced with these Defendants' circumstances would

know it is a violation of the constitution to either create, or present deceptive evidence against a parent in juvenile court proceedings. *Hardwick v. Cty. of Orange*, (9th Cir. 2017) 844 F.3d 1112, 1118-19; "No official with an IQ greater than room temperature in Alaska could claim that he or she did not know that the conduct at the center of this case violated both state and federal law. The social workers in this case are alleged to have knowingly and maliciously violated the law in their attempt to sever [Plaintiff's] protected relationship with her [daughter]. Perjury is a crime under both federal and California state law, as is the knowing submission of false evidence to a court. 18 U.S.C. § 1621; Cal. Penal Code § 118. Both crimes make no distinction between criminal and civil proceedings. This malicious criminal behavior is hardly conduct for which qualified immunity is either justified or appropriate."

53.     At all relevant times alleged herein, Defendants, and each of them, were acting under color of state law when they acted, agreed, and/or conspired to employ fraudulent tactics to remove and detain, and continue to detain, Baby S. from Plaintiffs' custody first by creating false evidence, then later by presenting known materially false, incomplete, and misleading evidence to the Juvenile Court.

54.     The actions of these Defendants, and each of them, as alleged herein above were undertaken with a knowing and deliberate indifference to Plaintiffs' rights, and/or with the specific intention of harming them both personally and in their relationship with their child, Baby S.

55.     These Defendants, and each of them, maliciously conspired to violate Plaintiffs' constitutional rights including their rights arising under the First and Fourteenth Amendments to the United States Constitution – and did violate their rights by, but not limited to: The creation and propagation of false information in Defendant Giarnina's contact notes with the intention that said information be incorporated into later Court Reports by others; and then later, by the making of knowingly false reports of child abuse; the intentional fabrication of inculpatory evidence by Defendants Giardina, and Sawyer, DOE HHSA Workers 2 - 10, and DOES 1 through 20, inclusive – all knowing and

intending that it would be presented to the Juvenile Court, accepted into evidence, and relied upon by the juvenile court in making its decisions.

56.     The aforementioned conduct by these Defendants, and each of them, was malicious and had the effect of denying Plaintiffs their right to a fair hearing as well as their rights to continued custody of their daughter, Baby S., for an unnecessary and excessive period of time. By spreading lies, maliciously refusing to provide exculpatory evidence, and presenting fabricated evidence to the Juvenile Court during the pendency of the dependency proceedings these Defendants, and each of them, knowingly and intentionally violated Plaintiffs' rights arising under the First and Fourteenth Amendments to the United States Constitution.

57.     As a direct and proximate result of these Defendants' actions Plaintiffs have suffered and will continue to suffer economic injury, mental and emotional injury as well as physical manifestations of such mental and emotional suffering, all to an extent, degree, and amount subject to proof at trial.

58.     Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, acted with malice, oppression and fraud or otherwise acted with a willful, wanton, knowing, and conscious disregard for Plaintiffs' rights in a despicable, vile and contemptible manner. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing these Defendants, and each of them, in order to deter them, and others similarly situated, from similar such misconduct in the future.

**FOURTH CLAIM FOR RELIEF (42 USC §1983)**

***Monell Related Claims***

(By Plaintiffs Against Defendant County of San Diego)

59.     Plaintiff incorporates all of the above allegations as though fully set forth herein. Defendant County of San Diego, including through its entity HHSA, and those individuals in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiffs and those similarly situated to establish, implement and follow policies, procedures, customs and/or practices which conform with, and provide for the

protections guaranteed Plaintiffs under the United States Constitution, including those under the First and Fourteenth Amendments. This includes, without limitation, protection of the right to substantive and procedural due process and to be free of unwarranted governmental interference in the custody of their child, Baby S.

60.    Defendant County of San Diego also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within HHSA, so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

**Count One**

***Unwarranted Seizure of a Child***

61.    Plaintiff incorporates all of the above allegations as though fully set forth herein.

62.    Based on the duties charged to the County and delegated to its social workers, including the powers to seize children from their parents' custody, the County knew or should have known of the need to establish policies, practices, and customs required to protect the civil rights of parents and children with whom their agents regularly came into contact – and to adequately train its HHSA workers.

63.    At the time of the underlying events, the County's customs and practices relating to the removal of a child from its parent's custody included, but were not limited to:

    a.    The custom and/or practice of removing children from their parents' custody without consent or a court order, in the absence of exigent circumstances (i.e., imminent danger of serious bodily injury).

    b.    The custom and/or practice of removing children from their parent's custody without first performing a reasonable investigation.

c.   The custom and/or practice of seizing children from their parent's custody without consent, court order, and/or exigency, based on a hope that further investigation would turn up facts suggesting the seizure was justified.

d.   The custom and/or practice of continuing the detention of children from their parents in spite of the fact that there was no known legitimate or legal basis to do so.

64.   When Defendants Nick Macchione, Kimberly Giardina, DOE HHSA Workers 2 - 10, and DOES 1 through 20, inclusive, seized Baby S. from Plaintiffs' custody, they were acting pursuant to and in accordance with the County's child removal customs, polices, and practices.

65.   Baby S.'s unwarranted seizure and continued unjustified detention from his parents was not an isolated incident. Instead, County social workers regularly seize children from their parent's custody without consent, court order, and/or exigency. These past unlawful seizures have resulted in several lawsuits against multiple offending social workers (for violation of constitutional rights) and the County (for its customs being the moving force behind these violations). Thus, the County of San Diego is, at minimum, on at least inquiry notice of the existence of a substantial deficiency in its policies, customs, and/or practices.

66.   The County never investigates or disciplines its social workers (including those named as Defendants in the lawsuits identified above) who seize children from their parents' custody without consent, court order, and in the absence of exigency. The County did not investigate or discipline these Defendants for their unwarranted seizure of Baby S. Nor has the County disciplined any of the individual Defendants for failing to intervene to stop Baby S.'s unwarranted seizure, even though it was *admittedly* obvious the seizure was unlawful.(See **Exhibit 1**) The County did not discipline any of the individual Defendants for as a result of Baby S.'s admitted unwarranted seizure from Plaintiffs' custody.

67.   Even though the County has been sued for similar such conduct on multiple occasions and admits that further and/or better training and supervision is needed, the

County has remained deliberately indifferent to this admitted need and has refrained from implementing a further, constitutionally adequate, program of training and supervision. Thus, through it's action or inaction, the County ratified and/or approved of these Defendants' unwarranted seizure and continued unjustifiable detention of Baby S.

68.    The County has consistently failed to adequately train its social workers and agents on the constitutional rights of a parent and child, including but not limited to:

a.    The circumstances under which a court order must be obtained prior to removing a child from the custody of its parent(s).

b.    The fact that a court order or parental consent must be obtained prior to removing a child from the custody of its parent(s), when there is no exigency.

c.    That a child cannot be removed without a court order or parental consent, unless there is "specific, articulable evidence" that a child is in imminent danger of suffering serious bodily injury.

d.    That a social worker cannot remove a child without a court order or consent, based on the hope that further investigation could turn up facts suggesting that an exigency existed.

e.    That a child cannot be removed from their parent's custody without first performing a reasonable investigation.

69.    The County's deliberate failure to train its agents on these established constitutional rights, and to avoid violating them, was a substantial factor and moving force in causing Plaintiffs harm. Without adequate training, the individual Defendants were unfamiliar with and oblivious to Plaintiffs' rights when they seized Baby S. – without consent, court order, or exigency.

70.    The County knew or should have known that a parent and child cannot be separated without consent, court order, and/or exigency. But, the County has knowingly refrained from (1) revising and/or implementing its child removal customs and protocols, and (2) from training its social workers that a child cannot be removed without consent,

court order, and/or exigency. In addition, the County has consistently refused and refrained from investigating and/or disciplining its social workers for removing a child without consent, court order, and/or exigency – including the individual Defendants in this case.

71.    These actions, and/or inactions, of the County were the moving force behind the Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, in an amount to be proven at trial.

## Count Two

### *Unwarranted Investigatory Medical Exam/Procedures*

72.    As detailed above, County of San Diego regularly and systematically performed, and to this day continues to perform on a regular basis, non-consensual unwarranted invasive forensic medical examinations upon children in relation to whom referrals of suspected child abuse have been received.

73.    San Diego County regularly requests these medical examinations be performed without notifying either parent prior to the examination even though the County has known since at least the year 2000 that parents have a constitutional right to be present for their child's medical procedures. Moreover, the County regularly requests that parents be excluded from the examination room in violation of those same constitutional rights.

74.    The County, at all relevant times, had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all its agents, officers, employees and those acting under them, so as to protect the constitutional rights of Plaintiffs and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

75.    Based on the duties charged to the County of San Diego, its policymaking officials knew or should have known of the need to establish such customs, policies, and practices as were required to protect the rights of children and parents to remain free of unwarranted non-consensual forensic medical examinations and medical procedures.

76.    At the time of the underlying events, the regularly established customs and practices of the Defendant County that were followed, adhered to, complied with, and

carried out by the individual Defendants in this case were the moving force that caused the violations of the Plaintiffs constitutional rights including, but not limited to the following policies, customs, and/or practices:

    a.    The custom and/or practice of subjecting children to unwarranted non-consensual forensic medical examinations.

    b.    The custom and/or practice to exclude a parent from the examination room during the forensic medical examination.

    c.    The custom and/or practice of barring a parent from access to the child's medical records even though the parent retains medical rights.

    d.    The custom and/or practice of subjecting children to unwarranted non-emergency medical procedures, including vaccinations without a parent's knowledge and/or consent.

    e.    The custom and/or practice of subjecting children to unwarranted non-consensual vaccinations.

    f.    The custom and/or practice to never notify a parent that vaccinations will be performed on their child.

    g.    The unwritten policy of acting with deliberate indifference to the rights of children and parents with whom Defendants' agents can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or by failing to train and/or supervise their respective officers, contractors, agents, and/or employees, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments, relative to a parent and

child's medical rights when performing actions related to child abuse investigations.[1]

77.    When the individual Defendants either performed or directed that Baby S. be subjected to an investigatory examination, they were acting pursuant to and in accordance with San Diego County's customs, unwritten policies, and practices with regard to conducting such examinations without first obtaining a warrant or parental consent under non-emergency circumstances.

78.    As a matter of routine, the County of San Diego never investigates or disciplines its HHSA employees, contractors, and/or agents who perform investigatory medical examinations on children – without consent, court order, exigency. Nor does the County as a matter of practice even inquire to determine whether there was a basis to perform the requested examinations.

79.    Here, San Diego County did not investigate or discipline the individual Defendants for performing the unwarranted investigatory medical examinations and/or procedure on Baby S.

80.    Moreover, Defendant San Diego County refuses to admit that performing an examination and/or procedure without parental consent, court order, and/or exigent circumstances violates a parent's and child's constitutional rights. Defendant denies that either it, or the individual Defendants, violated Plaintiffs' rights when Defendants subjected Baby S. to these unwarranted examinations and/or procedures without parental consent, emergency or a court order.

81.    Defendant County of San Diego ratified and/or approved of Baby S.'s non-consensual unwarranted investigatory medical examinations and procedures.

---

[1] The above list is not exhaustive. Plaintiffs may seek leave to amend this Complaint as additional information is discovered.

82.    Defendant County of San Diego knowingly and with deliberate indifference failed to train its HHSA employees and/or agents on the constitutional rights of a parent and child, including but not limited to:

a.    That a child cannot be examined outside the presence of his or her parent(s) – without judicial authorization or parental consent – when there is no specific, reasonable, and articulable evidence that the child is in immediate risk of suffering serious bodily injury.

b.    That a child cannot be subjected to an investigatory medical examination – without parental consent, court order, and/or exigent circumstances.

c.    That an independent investigation and/or inquiry must be performed to determine whether or not there is a basis for performing an unwarranted and non-consensual investigatory medical examination on a child.

83.    Without adequate training, the individual Defendants, and each of them, were unfamiliar with and oblivious to Plaintiffs' constitutional rights, when they subjected Baby S. to investigatory medical examinations and/or procedures – without parental consent, court order, and/or exigency.

84.    San Diego County's non-consensual unwarranted investigatory medical examination of Baby S. was not an isolated incident specific to Plaintiffs' circumstances. On the contrary, such warrantless non-consensual medical examinations and procedures are routine, regular and recurring events, and are perpetrated by San Diego County and its HHSA workers on a daily, or near daily, basis in the same or similar circumstances as alleged herein.

85.    The County of San Diego has engaged in each of the above customs and/or practices on an ongoing and continuous basis since well before the events described herein, and continues to engage in said practices on an ongoing and daily basis, and will continue to do so until ordered to stop.

86.     These customs, policies, and/or practices and lack of adequate training and supervision of Defendant County were the moving force behind, and the direct and proximate cause of the injuries sustained by Plaintiffs. As a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven separately at trial.

### Count Three
### *Judicial Deception*

87.     The County and its policymaking officials knew, or in the exercise of reasonable care, should have known of the need to establish customs, policies, and practices required to protect the aforementioned civil rights of children with whom their agents regularly came into contact – and to adequately train its HHSA employees regarding constitutionally appropriate policies and practices.

88.     Defendant County of San Diego established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the individual Defendants, and each of them when they violated Plaintiffs constitutional rights by engaging in deception in the presentation of evidence to the juvenile court, among other things.

89.     At the time of the underlying events, the regularly established customs and practices of the County of San Diego and the HHSA were followed, adhered to, complied with, and carried out by the individual Defendants, and each of them, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiffs' constitutional rights including, but not limited to:

     a.    The custom and/or practice of including false, inaccurate, exaggerated, misleading, and/or untrue factual statements in the documents and/or reports filed with the juvenile court.

     b.    The custom and/or practice of suppressing and/or omitting known exculpatory evidence from documents and/or reports filed with the juvenile court.

c.   The custom and/or practice of permitting a supervisor to sign a document and/or court report without personal knowledge as to whether the statements made therein were complete and/or true, in an effort to bolster the credibility of the document, and/or report.

d.   The custom and/or practice of placing alleged statements of third-party witnesses in quotation marks when in fact those third-party witnesses did not say was the HHSA worker claimed. The purpose of such practice is to lend further weight and credibility to false and/or fabricated information the particular HHSA worker presents to the Juvenile Court.

90.    When Defendants, and each of them, engaged in deception in the presentation of evidence to the juvenile court, they were acting pursuant to and in accordance with the County's regularly established customs and/or practices. Indeed, the reports and/or other documents, filed with the juvenile court in the underlying dependency case at issue here, were reviewed and approved by HHSA supervisors.

91.    The individual Defendants' presentation of false, fabricated, incomplete and fraudulently misleading evidence to the juvenile court was not an isolated incident specific to Plaintiffs' circumstances or the circumstances of this particular case. Instead, the County and its HHSA workers regularly include false statements, and/or suppress known exculpatory evidence, in reports and/or other documents filed in the juvenile court. Such deceptive conduct by County HHSA workers has resulted in lawsuits and claims against multiple offending HHSA workers (for similar violations of constitutional rights) and San Diego County (for its customs being the moving force behind these violations). These include, but are not limited to, the following: **(1)** *Marshall v. County of San Diego*, State Case No. 37-2008-00085115-CU-CR-CTL; and **(2)** *Kemper v. County of San Diego*, State Case No. 37-2010-00094707-CU-CR-CTL; **(3)** *Garcia v. County of San Diego et al.*, 15cv0189JLS(NLS); **(4)** *D.C. v. County of San Diego et al*., 18-cv-0013-WQH-DEB. Yet, the County of San Diego has habitually and

deliberately turned a blind eye to the problem and refrained from taking any reasonable steps to rectify it.

92.   County of San Diego has engaged in each of the customs and/or practices identified above on an ongoing and continuous basis since at least 2005, if not earlier, and continues to engage in these practices on an ongoing and daily basis.

93.   The County of San Diego regularly receives and/or is aware of complaints, leveled against its HHSA workers, claiming that the social workers are engaging in deception in the presentation of evidence in the juvenile court.

94.   Yet, for whatever reason, the County of San Diego never investigates or disciplines its HHSA workers (including those named as Defendants in the other lawsuits identified above) who actually do engage in deception in the presentation of evidence to the juvenile court. The County of San Diego consistently fails to investigate or discipline social workers and their supervisors who are involved in alleged constitutional violations so that violations of citizen's constitutional rights have not only become accepted but are customary.

95.   The County did not investigate or discipline the individual Defendants in this case for making false statements, and/or suppressing known exculpatory evidence, in reports or other documents they filed in the juvenile court.

96.   The County habitually refuses to admit that its HHSA workers commit a constitutional violation when they make false statements, and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court – and continues to do so. The County denies that the individual Defendants in this case violated Plaintiffs' rights when they made false statements, and/or suppressed exculpatory evidence, in reports or other documents filed in the juvenile court. The County ratified and/or approved the inclusion of false statements, and/or suppression of known exculpatory evidence, in reports or other documents filed in the juvenile court.

97.   The Defendant County of San Diego is aware that its HHSA workers frequently make false statements and/or suppress known exculpatory evidence, in reports

or other documents filed in the juvenile court. Yet, Defendant County of San Diego has made the knowing and conscious decision to refrain from promulgating a policy and recurrent training to prevent such misconduct and has consistently and knowingly failed to provide any training to their social workers to inform them of the rights of parents and children to not be lied about in court reports, and the requirement that all material exculpatory evidence is required to be presented to the juvenile court.

98. The Defendant County of San Diego's decision to disregard these constitutional protections in the face of a known need for such policies to prevent the specific misconduct alleged herein above, *i.e.*, the known need for a specific policy prohibiting the aforementioned misconduct, is itself a "policy" decision which constitutes a policy of deliberate indifference.

99. This policy of deliberate indifference, and the lack of prophylactic policies and training in the face of a known need for such policies and training was a substantial factor in causing the Plaintiff harm, in that individual Defendants, and each of them, followed and acted pursuant to the regularly established customs, practices, and well known and accepted standard operating procedures of HHSA when they made false statements and/or suppress known exculpatory evidence, in reports or other documents filed in the juvenile court – none of which was constitutionally permissible.

100. The County of San Diego has openly taken the position that it is not clearly established and/or understood that a social worker could not lie and/or fabricate evidence in proceedings before the juvenile court. The County of San Diego has also taken the position that a social worker does not violate constitutional rights when they suppress exculpatory evidence in juvenile proceedings. These "positions" constitute unwritten policies of the County.

101. Without such policies, procedures, customs and/or practices in place, the County of San Diego HHSA Workers have been allowed and permitted to engage in conduct that was in violation of Plaintiff's constitutional rights as more specifically set out in the General Allegations above.

102.   Defendant County's failure to adopt appropriately prophylactic policies and training was the moving force behind the violations of Plaintiffs' constitutional rights. Such failures include, but are not limited to the following:

a.    The County of San Diego did not have a written policy, procedure, custom, practice and/or recurrent training delineating the constitutional protections afforded to a parent and child by the First and Fourteenth Amendments.

b.    The County of San Diego did not have a written policy, procedure, custom, practice and/or recurrent training instructing that a county social worker must disclose all known exculpatory evidence to the juvenile court.

c.    The County of San Diego did not have a written policy, procedure, custom, practice and/or recurrent training instructing that a county social worker is precluded from knowingly including false statements in documents or reports to the juvenile.

d.    The County of San Diego did not have a written policy, procedure, custom, or practice requiring its social workers to be complete, honest, and accurate in their reports (and other filings) with the court.

e.    The County of San Diego did not have a written policy, procedure, custom, or practice requiring its social workers and social worker supervisors to have personal knowledge of the facts and/or statements made in a petition, document, and/or report, when attesting to the veracity of those allegations, facts, and/or statements.

f.    The County of San Diego did not have a written policy, procedure, custom, or practice requiring its social workers and social worker supervisors to conduct an independent investigation to determine whether the allegations, facts, and/or statements in a petition,

COMPLAINT FOR DAMAGES

document, and/or report were true, before attesting to the veracity of those allegations, facts, and/or statements.

g.   The County of San Diego did not have a policy or procedure that addressed California Government Code, §820.21, *i.e.* civil immunity for a social worker is lost if they commit perjury, fabricate evidence, or fail to provide known exculpatory evidence.

103.   By deliberately refraining from promulgating any of the aforementioned policies, procedures, customs, practices and/or training, the County permitted the aforementioned basic policy decisions to be made by the lower-level social workers in the field. As a result, the Defendant County of San Diego's policy, custom, and/or practice – as established, adopted, and implemented by the individual Defendants in this case, and each of them, was to make false statements and/or suppress known exculpatory evidence in reports and documents filed with the juvenile court, and to continue to detain the children or otherwise cause the continued detention of the children even thought it was known that there was no legitimate "true" basis to do so.

104.   These policies, customs, and/or practices – that disregard the Plaintiffs' constitutional protections – were a substantial factor in causing harm to the Plaintiffs'. Thus, as a matter of law, because there was no formal policy preventing the aforementioned misconduct, even though one was obviously needed, the social workers on the line acted on behalf of the County in making final policy decisions – which is exactly what they did when they made false statements and/or suppressed known exculpatory evidence in reports and documents filed with the juvenile court.

105.   The state of the law regarding the constitutional protections afforded to parents and a child by the First and Fourteenth Amendments was clearly established well before June 2019. As such, the Defendant County of San Diego knew before 2019 that its HHSA workers required recurrent training on the constitutional protections afforded to parents and children.

COMPLAINT FOR DAMAGES

106.   Despite this knowledge, the Defendant County of San Diego deliberately failed to train or, alternatively, deliberately failed to provide recurrent and updated training to its HHSA workers on the following constitutional protections:

a.   That a social worker must disclose all known inculpatory and exculpatory evidence to the juvenile court.

b.   That a social worker must be truthful, honest, and accurate when reporting and/or presenting evidence to the juvenile court.

c.   That a social worker is precluded from lying to and/or including false statements and/or suppressing important information from documents or reports to the juvenile court.

d.   That a social worker must disclose all known exculpatory evidence in documents and/or reports that will be relied upon by subsequent social workers.

e.   That a social worker is precluded from lying to and/or including false statements and/or suppressing important information from documents and/or reports that will be relied upon by subsequent social workers.

f.   That quotation marks can only be used when the speaker's words are being reproduced verbatim.

107.   Defendant County of San Diego's deliberate failure to train its HHSA workers on these established constitutional protections was a substantial factor in causing the Plaintiffs harm, in that HHSA agents were unfamiliar with and oblivious to the Plaintiffs constitutional rights, when they made false statements and/or suppressed known exculpatory evidence in reports and documents filed with the juvenile court, and then continued to detain the children from their Plaintiffs' care for a period of months even though they knew there was no legitimate basis to do so.

108.   The practice of turning a deliberate blind eye to the need for further or adequate training by ignoring repeated violations of the rights of children and parents with whom HHSA agents can regularly be expected to come into contact by failing and/or

refusing to implement a practice of regular and adequate training and/or supervision, and/or failing to train and/or supervise its officers, agents, employees and state actors, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First and Fourteenth Amendments to the United States Constitution.

109.   Defendant County of San Diego, including by and through its entity HHSA and its policymaking officials, breached its duties and obligations to Plaintiffs by, but not limited to, failing to establish, implement and follow the correct and proper constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control, and review its agents and/or employees as to their compliance with constitutional safeguards; and by deliberately permitting the individual Defendants, and each of them, to engage in the unlawful and unconstitutional conduct as herein alleged, with a total and deliberate indifference to Plaintiff's rights.

110.   Defendant County of San Diego knew, or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that its agency policies, practices, customs, and usages would, and did, directly cause Plaintiffs to be injured and damaged.

111.   These actions, and/or inactions, of the Defendant County of San Diego were the moving force behind, and direct and proximate cause of Plaintiffs' injuries. As a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.

### JURY DEMAND

Plaintiffs Shantilese Daniels and Otis Evans demand a jury trial as to all issues so triable.

### PRAYER

**WHEREFORE**, Shantilese Daniels and Otis Evans pray for judgment against Defendants, and each of them, as to all causes of action, as follows:

1. General damages and special damages according to proof, but in no event less than $1,000,000;

2. As against the individual, human being, Defendants, punitive damages as allowed by law;

3. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other appropriate statute;

4. Injunctive relief as allowed by law;

5. Such further relief as the Court deems just and proper.

Dated:  February 16, 2023                          TREMBLAY BECK LAW


/s/ Dave Carothers
Dave Carothers
Attorneys for Shantilese Daniels and
Otis Evans

COMPLAINT FOR DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

# EXHIBIT 1

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

COMPLAINT FOR DAMAGES





# County of San Diego
## OFFICE OF COUNTY COUNSEL
### CLAIMS AND INVESTIGATION DIVISION
1600 PACIFIC HIGHWAY, ROOM 355, SAN DIEGO, CALIFORNIA 92101-2469

August 18, 2022

Shantilese Daniels and Otis Evans
c/o Tremblay Beck Law
5330 Carroll Canyon Rd., Ste. 230
San Diego, CA 92121

Re: Client/Claimant: Shantilese Daniels and Otis Evans
County File Number: 220267
Date of Incident: multiple

SUBJECT: **NOTICE OF RETURNED CLAIM FOR DATES DECEMBER 11, 2021 TO JANUARY 6, 2022**
(No Action Taken; Claim Late)

The claim you presented to the Board of Supervisors of the County of San Diego on July 7, 2022, is being returned because it was not presented within six (6) months after the event or occurrence as required by law. See Sections 901 and 911.2 of the Government Code. Because the claim was not presented within the time allowed by law, no action was taken on the claim.

Your only recourse at this time is to apply in writing without delay to the Board of Supervisors of the County of San Diego for leave to present a late claim, c/o **Liability Claims Section; County of San Diego; 1600 Pacific Highway, Room 355; San Diego, CA 92101**. See Sections 911.4 to 912.2, inclusive, and Section 946.6 of the Government Code. Under some circumstances, leave to present a late claim will be granted. See Government Code Section 911.6.

SUBJECT: **NOTICE OF REJECTION OF CLAIM FOR DATES JANUARY 7, 2022 TO PRESENT**

The subject claim has been received by the Claims Division for investigation and a determination of liability, if any.

The liability of a governmental entity and its employees to a person who claims damages is strictly limited by the laws within the State of California. Your claim has been reviewed within the terms and restrictions of those laws. We regret that investigation has obliged us to conclude that the claim must be rejected. Therefore, the claim is hereby rejected this date.

M                                    2                    August 18, 2022

**WARNING**

Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on those causes of action recognized under the Government Claims Act.  See Government Code Section 945.6.

You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.

Sincerely,

Office of County Counsel
Claims and Investigation Division
(619) 531-4899

7 July 2022

Nick Macchione, FACHE
Agency Director

Kimberly Giardina, DSW, MSW
Director Child Welfare Services

County of San Diego
Health and Human Services Agency
Child Welfare Services
8965 Balboa Avenue
San Diego, CA 92123-1507

Melissa Sawyer, PSW
389 N. Magnolia Ave
El Cajon, California 92020

San Diego County Counsel
1600 Pacific Hwy #355
San Diego, CA 92101



Re: Claim Against County of San Diego and Child Protective Services/Shantilese
Daniels and Otis Evans; County of San Diego Health and Human Services Agency (Related File –
Referral # 0487-6995-5314-5083122)

To Whom It May Concern:

My name is Dave Carothers. I am a lawyer representing Shantilese Daniels and Otis Evans
arising from their horrific experience with Child Protective Services commencing December 11,
2021 when her two-month old baby was abruptly taken from their home by CPS.

Ms. Daniels and Mr. Evans are both County residents. They have three children. They are
African American.  As a family, they were severely mistreated by the conduct perpetrated by
county social worker, Melissa Sawyer, resulting in various violations of their civil rights and are
now suffering from severe emotional distress.

Ms. Daniels works as a manager for a well-known coffee chain. Her significant other, Otis Evans,
have been together for 17 years. She has three children, Shantilese, 14, Otis, 11 and Syncere, 2
months. At the time of the incidents described below. Mrs. Daniels was still breast feeding
Syncere. Neither Mrs. Daniels nor Mr. Evans has any prior CWS history.

On Monday, December 6, 2021, as she was bathing baby Syncere, she noticed two very small
red "spots" on the bottom of Syncere's right foot. Other than the two red spots on the bottom
of Syncere's right foot, he was his typical smiling, happy and energetic self as his mom got him
ready for the day. While concerned about the two red spots, Mrs. Daniels noted mentally that
she and the baby had an appointment with the pediatrician the next day, December 7, 2021,
and would bring it to the doctor's attention.

The next day on Tuesday, December 7, Mrs. Daniels kept the appointment at Kaiser. The pediatrician, Saadia Irem Khan, M.D. ("Dr. Khan"), conducted a complete physical examination and deemed Syncere healthy until Ms. Daniels, at the end of the appointment, remembered the two red dots on the bottom of Syncere's right foot and highlighted it for the doctor. The Dr. Khan had failed to notice it during her examination. But for Ms. Daniel pointing it out, would have passed on it. Upon reexamining Syncere, Dr. Khan noted she was unfamiliar with the two red dots, stating she had not observed anything like it before. Dr. Khan took a picture of the bottom of Syncere's right foot and informed Ms. Daniels she would refer the pictures to Dermatology.

On December 8, Wednesday, having heard nothing from Dr. Khan, Mrs. Daniels called and left a message for the doctor. Dr. Khan called back and said she had been extremely busy but reiterated that shw would go ahead and send the picture she took the day before to Dermatology.

On December 9, Thursday, Dr. Khan called and asked Mrs. Daniels, "Did Sincere kick something with his right foot that caused injury. Mrs. Daniels responded, "No". Ms. Daniels also inquired about the results of the blood workup. The doctor responded with a puzzling statement, "I will be doing an investigation, and someone will be in contact with you." However, the doctor never informed Mrs. Daniels what she, the doctor, concluded about the two red dots at the bottom of Syncere's right foot.

On December 10, Friday, about mid-morning, a caseworker by the name of Melissa Sawyer was at Ms. Daniels' door, asking for entry. She informed Ms. Daniels that she had just left the school where Mrs. Daniels' older kids attended and questioned them. Ms. Sawyer then began physically examining baby Syncere! Shortly thereafter, ***Ms. Sawyer announced that the Pediatrician's report did not match the physical examination Ms. Sawyer had just conducted on the baby at Mrs. Daniels home.*** Apparently, the "pediatrician's report" detailed that when she saw baby Syncere back on December 7, there was a bruise "on his face and bruises between his toes and bottom of his foot. Ms. Sawyer stated verbally before Ms. Daniels that she saw nothing corroborating what the pediatrician described. In fact, the "two red dots" that were seen on the bottom of baby Syncere's right foot were no longer there. Ms. Sawyer confirmed that the suspected "bruise" was simply a birthmark and confirmed there were no "bruises" between the baby's toes.

Notwithstanding the aforementioned physical findings, Ms. Sawyer called her supervisor and at the conclusion of that call Ms. Daniels was told to cancel everything for the day and to accompany Ms. Sawyer to Rady's hospital for baby Syncere to be examined yet again. Ms. Daniels arrived at Rady's at 1 p.m. and could not leave until 8:30 that night. At the conclusion of what started out already as a nightmarish day, Ms. Daniels was being charged with allegations that Syncere, when presented to Dr. Khan on December 7, had bruising and an inflicted injury. She was then ordered to immediately report to Rady's hospital with her baby. Ms. Daniels was told that the baby could not return home with her and that she could never be alone with her baby again. The only accommodation that would be permitted was having a family member

come and pick up the baby from the hospital. Ms. Daniels was spent, overwhelmed, confused and emotionally distraught. A good number of friends and family members, who had arrived to hospital, attempted to console her but it was useless as her baby had just been taken from her and everyone observed that her pain was palpable. Thereafter, the nursing and bonding she experienced with Syncere was cutoff. Her time with baby was restricted to traveling to a relative's house, feeding her baby and then having to promptly leave. She and the family were ordered that she could never be alone with baby Syncere.

On December 20, Ms. Sawyer called Ms. Daniels to say that the "doctor" had concluded that the "bruise" was an "inflicted injury" and that the order was that she still could not have her baby returned to her.

There can be no debate the emotional toil this has taken on Ms. Daniel's psyche and impact on her, her ability to be mother to her other children and the extreme emotional toil she suffered as a nursing mother. Ms. Daniels in her grief and pain followed every direction by CPS. On January 18, 2022, Mr. Evans and Ms. Daniels were informed by a form letter from Ms. Sawyer that "After conducting an investigation, we have concluded that this referral may be closed effective January 18, 2022." No findings of the "investigation" were ever shared with Mr. Evans or Ms. Daniels. This cursory ending to the dramatic and unsupported taking of her child with the additional allegations that the baby was bruised and suffering from an inflicted injury only made their emotional pain worse.

Obviously, there was no real investigation. The "investigation" was an after the fact cover up of what was clearly an attempt by the County and CPS to cover themselves. The Defendants took undue liberties with this Black family. The County ran roughshod over this family exhibiting a callous disregard for the wellbeing of this couple's family. We believe they reached certain conclusions based on the family's race and not on the evidence. How does a social worker go from observing the baby on December 10, and concluding that she saw nothing consistent with the "report" of the doctor and later jumping to the allegation that the baby suffered "serious injury" and Ms. Daniels and Mr. Evans were now a "threat and danger to Syncere's safety"?

The County and the social worker violated Ms. Daniels' and Mr. Evans' civil rights as guaranteed by the California and U.S. Constitutions, 42 U.S.C. 1983 and causing extreme emotional distress. We are aware of other Black families who have raised similar issues. They both seek recovery for their severe emotional distress and recovery of attorney's fees. The extreme mental suffering and pain suffered by them both throughout this process, which had no evidentiary support, must be addressed and acknowledged by the County of San Diego and CPS.

Respectfully submitted,

Dave Carothers
Tremblay Beck Law

5330 Carroll Canyon Road
Suite 230
San Diego, CA 92121
858.792.7492
dave@tremblaybecklaw.com