0UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANTILESE DANIELS, an individual; OTIS EVANS, an individual,<br><br>                                        Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, a public entity; MELISSA SAWYER, an individual; DOE HHSA Workers 2 through 10, known but unidentified individuals; and DOES 1 through 20, inclusive,<br><br>                                        Defendants. | Case No.:  3:23-cv-00316-JES-BGS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>**[ECF No. 15]** |

Before the Court is Defendants County of San Diego ("County") and Melissa Sawyer's ("Sawyer") (collectively "Defendants") motion to dismiss. ECF No. 15. The motion was filed on July 20, 2023. Shantilese Daniels ("Daniels") and Otis Evans ("Evans") (collectively "Plaintiffs") filed their opposition and Defendants filed a reply. On September 13, 2023, the Court heard oral argument on the motion and took it under submission. ECF No. 18. After due consideration, and for the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the motion to dismiss.

/ / /

## I.   PLAINTIFF'S ALLEGATIONS

Plaintiffs are the parents of three children, Shantilese, age 14, Otis, age 11 and Baby S, 2 months old at the time of the incident. First Amended Complaint ("FAC") ¶ 18. Daniels was breast-feeding Baby S at the time of the incident. *Id.* On Monday, December 6, 2021, Daniels was bathing Baby S and noticed two very small red "spots" on the bottom of Baby S's right foot. FAC ¶ 19. While concerned about the red spots, Daniels noted mentally that she and Baby S had an appointment with the pediatrician the next day on December 7, 2021, and she would bring the spots to the doctor's attention. *Id*.

On December 7, 2021, Daniels took Baby S to his pediatrician appointment at Rady's Children to see, Saadia Irem Khan, M.D. ("Dr. Khan"). FAC ¶ 20. Dr. Khan conducted a complete physical examination and deemed Baby S healthy. *Id.* At the end of the appointment Daniels brought the two red spots to the attention of Dr. Khan as Dr. Khan did not notice the red spots during her examination. *Id.* After reexamining the red spots Dr. Khan noted she was unfamiliar with the two red spots as she had not observed anything like it before. *Id.* Dr. Khan took a picture of the bottom of Baby S's right foot and informed Daniels that she would refer the pictures to dermatology. *Id.*

On December 8, 2021, Daniels called Dr. Khan and left a message since she had not heard anything regarding the two red spots. FAC ¶ 21. Later that day, Dr. Khan called Daniels and related that she had been extremely busy and would send the picture she took to dermatology. *Id.* On December 9, 2021, Dr. Khan called Daniels and asked her, "Did Baby S kick something with her right foot that caused injury?" FAC ¶ 22. Daniels responded, "No," and inquired about the results of the dermatology referral. *Id.* Dr. Khan then stated, "I will be doing an investigation, and someone will be in contact with you." *Id.* Dr. Khan never told Daniels her conclusions about the two red spots at the bottom of Baby S's right foot or any other concerns. *Id.*

On December 10, 2021, Daniels took Baby S to the Kaiser lab for blood work/testing as referred by Dr. Khan. FAC ¶ 23. Shortly after Daniels and Baby S

returned home from the Kaiser lab, Sawyer, a caseworker for the County of San Diego, arrived at Plaintiffs' door, asking for entry. FAC ¶ 24. Sawyer informed Daniels that Dr. Khan reported Baby S had a bruise on his face, bruises between his toes and on the bottom of his foot that were inflicted injuries. FAC ¶ 25. Sawyer also informed Daniels that she had just left the school where Daniels' older kids attended and questioned them. FAC ¶ 24. Plaintiffs did not receive prior notice or warning or give consent for the interview. *Id*. Sawyer then conducted a physical examination of Baby S. FAC ¶ 25. After the examination, Sawyer then stated to Daniels that she saw nothing corroborating what the pediatrician described. *Id*. Daniels then explained to Sawyer that Baby S never had any bruises on his face, only his birthmark. *Id*. Daniels also explained to Sawyer that there were never any bruises between Baby S's toes and that she herself had asked the pediatrician to check the red sports on the bottom of the baby's foot. *Id*. Sawyer confirmed that the suspected bruises were a birthmark and confirmed there were no bruises between the baby's toes. *Id*. Further the two red spots that were previously seen on the bottom of Baby S's right foot were no longer visible. *Id*. Sawyer then excused herself to call her supervisor and at the conclusion of the 30-minute call, Sawyer told Daniels to cancel everything for the day and to accompany her to Rady's Children's Hospital for Baby S to be examined. FAC ¶ 26.

Daniels arrived at Rady's with Baby S at approximately 2 p.m. and did not leave until 8:30 p.m. that night. *Id*. At Rady's, Baby S had a round of blood work, despite Daniels informing Sawyer that she had brought Baby S to the Kaiser lab for blood work earlier that same day. FAC ¶ 27. Baby S also had x-rays and further examinations. *Id*. All the examinations, x-rays and tests confirmed that Baby S was healthy and normal with no physical signs to support any claim of abuse or inflicted injury. *Id*. Sawyer, a sheriff deputy and doctors told Daniels that because Baby S did not have any medical issues revealed by the examinations and was only two months old and not mobile, Daniels herself must have inflicted the reported bruises. *Id*. Daniels was repeatedly told they knew she had inflicted injuries on Baby S. *Id*. At the end of the day, Daniels was told that

Baby S could not return home with her and that she could not be alone with her baby. FAC ¶ 28. Plaintiffs were informed that they could not have custody of Baby S, who would be placed under the supervision of a third party. *Id*. Daniels was then told that as an accommodation, she would be permitted to have a family member come, get clearance to supervise Baby S and pick up the baby from the hospital to take to the family member's residence and serve as the caregiver for Baby S. *Id*. Daniels was overwhelmed and emotionally distraught. *Id*. Defendants allowed Daniels an accommodation to breast feed Baby S after Daniels' family reminded Defendants that Daniels was nursing Baby S. *Id*. Daniels was allowed to go to her relative's house to breast feed Baby S, but would not be allowed to be alone with Baby S and at all times would have to be accompanied and supervised by someone cleared as a caregiver by the Health and Human Services Administration ("HHSA") and Child Welfare services ("CWS"). *Id*. Daniels and the family were ordered that Daniels could never be alone with Baby S. FAC ¶ 29. Daniels objected to the arrangement, but Sawyer informed her that Defendants had "other options" if she did not comply, and Daniels did not want Baby S placed into foster care or some other arrangement. *Id*.

From December 10, 2021, through January 18, 2022, Daniels complied with all directions from Defendants while also seeking the return of custody of Baby S. FAC ¶ 30. Baby S was taken to the Chadwick Center for further examinations on two occasions, December 15, 2021, and December 28, 2021. *Id*. On December 15, 2021, Sawyer met Daniels at the relative caregiver's home, took custody of Baby S and drove the baby to the Chadwick Center with Daniels following in a separate car. *Id*. After the examination, Sawyer took custody of Baby S and drove him back to the relative's home with Daniels following in a separate car. *Id*. On December 20, 2021, Sawyer called Daniels to say that the doctor had concluded that the red marks on the bottom of the baby's foot was an inflicted injury and that the order was that she still could not have Baby S returned to her. FAC ¶ 31.

On December 28, 2021, Baby S had another medical examination, and all the x-rays and test results were normal. FAC ¶ 32. On that day, Daniels told Sawyer she was seeking to get full unsupervised custody and control of Baby S as soon as possible and Sawyer told her that the best she could hope for was to limit the process to an additional six months without full custody with Daniels being forced to complete six months parental instruction. FAC ¶ 34. Throughout the investigation, Daniels repeatedly sought to regain custody of Baby S and asked for her baby to be examined by a dermatologist who might be able to explain the problem, but her requests were denied. FAC ¶ 33.

On January 18, 2022, Plaintiffs were informed by a form letter from Sawyer that after investigating the referral was closed effective January 18, 2022. FAC ¶ 35. No results of the investigation were disclosed. *Id*. After Plaintiffs regained full custody of Baby S, Daniels noticed that Baby S would sometimes curl his toes, tighten, and flex his foot. FAC ¶ 37. Daniels took Baby S to a dermatologist who explained that red spots on his foot likely resulted from the baby's actions in tightening, flexing, and squeezing his right foot. FAC ¶ 38. The doctor said the conduct would go away as the baby got older and it was not a concern. *Id*.

Plaintiffs have alleged four causes of action, (1) that Sawyer interfered with and took away Plaintiff's rights of control and management over Baby S, including rights of unsupervised custody, without a warrant or other similar court order, under non-exigent circumstances in violation of the First and Fourteenth Amendments and that Sawyer interviewed and examined Plaintiffs' daughter without parental consent or authorization; (2) that Defendants violated Plaintiffs' constitutional rights to subject their child to a forensic medical examination without just cause, informed and voluntary parental consent or a court order/warrant authorizing the examination; (3) judicial deception; and (4) *Monell* related claims relating to each of the above alleged constitutional violations.

/ / /

/ / /

/ / /

## II.    LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim tests the legal sufficiency of a plaintiff's claim. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When considering the motion, the court must accept as true all well-pleaded factual allegations in the complaint. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The court need not accept as true legal conclusions cast as factual allegations. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient).

A complaint must "state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. To survive a motion to dismiss, a complaint must include non-conclusory factual content. *Id.* at 555; *Iqbal*, 556 U.S. at 679. The facts and the reasonable inferences drawn from those facts must show a plausible—not just a possible—claim for relief. *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 679; *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). The focus is on the complaint, as opposed to any new facts alleged in, for example, the opposition to a defendant's motion to dismiss. *See Schneider v. California Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998), *reversed and remanded on other grounds as stated in* 345 F.3d 716 (9th Cir. 2003). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The "mere possibility of misconduct" or "unadorned, the defendant-unlawfully-harmed me accusation[s]" fall short of meeting this plausibility standard. *Id.*; *see also Moss*, 572 F.3d at 969.

## III.    LEGAL ANALYSIS

### A. Defendant Sawyer's Motion

Turning first to Sawyer's motion, she argues Plaintiffs' first two claims should be dismissed based on qualified immunity, Plaintiffs' third claim should be dismissed for failure to state a claim and Plaintiffs have failed to sufficiently state facts to support a request for punitive damages.

### 1. Qualified Immunity

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and "[w]hen properly applied, [] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity attaches when an official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*)

Claims of qualified immunity require the court to consider two questions: (1) whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right, and (2) whether the right was clearly established—that is, whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001). Courts may exercise discretion in deciding which prong to address first. *Pearson*, 555 U.S. at 236. The absence of either element warrants a finding that immunity exists. *Shafer v. Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017).

"Plaintiffs bear the burden of proving that a constitutional right 'was clearly established at the time of the incident.'" *Benavidez v. County of San Diego*, 993 F.3d 1134, 1151 (9th Cir. 2021) (citation omitted). But, at the pleading stage, the Court resolves the question of qualified immunity "drawing all inferences in [the plaintiff's] favor." *Ballou v. McElvain*, 29 F.4th 413, 421 (9th Cir. 2022). "If the operative complaint 'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,' then plaintiffs are 'entitled to go forward' with their claims." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (citation omitted).

However, "[a] heightened pleading standard … appl[ies] in this circuit in section 1983 cases where the defendant is entitled to assert the qualified immunity defense and where her or his knowledge or intent is an element of the plaintiff's constitutional tort." *Lee v. City of Los Angeles*, 250 F.3d 668, 679 n.6 (9th Cir. 2001).

### a.  First Cause of Action

#### (1) Removal of Baby S

In the first cause of action, Plaintiffs allege Sawyer violated their rights under the First and Fourteenth Amendment. Specifically, Plaintiffs allege Sawyer's removal of Baby S without a warrant was an unlawful seizure and violated their rights of familial association. Further, Plaintiffs allege that Sawyer's conduct was an unwarranted interference with Plaintiffs' rights of care, management, and control of Baby S, including rights of full unsupervised custody. Sawyer argues Plaintiffs have failed to allege a violation of constitutional rights as there was no actual loss of custody. Further, Sawyer argues even if there was a violation of a constitutional right, the law was not clearly established, and Sawyer is entitled to qualified immunity.

The Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. Parents and children have a well-elaborated constitutional right to live together without governmental interference. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *see* also *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency. *Stanley*, 405 U.S. at 651.

The First Amendment also protects "family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" *Keates*, 883 F.3d at 1236 (citing *Lee*, 250 F.3d at 685 (quoting *Board of Dirs. v. Rotary Club*, 481 U.S. 537, 545 (1987)).

The right to familial association has both substantive and procedural components, thus placing a high burden of proof on the state and guaranteeing parents "fundamentally fair procedures" before the "state interven[es] into ongoing family affairs." *Scanlon v. County of Los Angeles*, 92 F.4th 781, 798 (9th Cir. 2024) (quoting *Santosky*, 455 U.S. at 753–54). The same legal standard applies in evaluating the right to familial association under the First and Fourteenth Amendment. *See Kaur v. City of Lodi*, 263 F.Supp.3d 947, 973 (E.D. Cal. 2017) (citing *Lee*, 250 F.3d at 686). Here, there was no judicial authorization to remove Baby S from Plaintiffs' home.

Officials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury. *Wallis v. Spencer*, 202 F.3d 1126, 1138 (2000). The state may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse. *Wallis*, 202 F.3d at 1138. Moreover, the police cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been—or will be—committed. *Id.* Whether a reasonable avenue of investigation exists, however, depends in part upon the time element and the nature of the allegations. *Id.*

Sawyer argues there was no seizure or removal of Baby S because a "plan" was installed that was agreed to by Plaintiffs where, to ensure that Baby S was safe, a relative of Daniels would be responsible for Baby S while CWS investigated the inflicted injury. ECF No. 17 at 2. Sawyer cites to *Capp v County of San Diego* and *Dees v. County of San Diego* to support her argument that Plaintiffs never lost custody or control of Baby S. However, Sawyer's reliance is misplaced.

In *Capp*, San Diego HHSA was investigating a child abuse claim amid a custody battle between the children's parents. *Capp v. County of San Diego*, 940 F.3d 1046, 1050

(9th Cir. 2019). A social worker contacted Capp, the children's father, and Capp learned for the first time that the social worker had interviewed his children at their elementary school without his consent. *Id.* at 1051. The social worker then encouraged the mother to file an emergency application in family court to remove the children from Capp's custody. *Id.* The mother filed an emergency application, but the court denied the application. *Id.* Capp then filed suit alleging interference with familial association under the Fourteenth Amendment based on the social worker's actions. *Id.* The district court dismissed the claim and the Night Circuit affirmed noting that Capp never actually lost custody of his children because of Defendants' alleged misconduct. *Id.* at 1060.

In *Dees*, San Diego HHSA was investigating a child sexual abuse claim during which Dees' children were removed from her home and temporarily sent to their biological father's home. *Dees v. County of San Diego*, 960 F.3d 1145, 1149 (9th Cir. 2020). The children were subsequently returned to their mother by the family court. *Id.* In wrapping up the investigation, a County social worker interviewed one of the children at school despite the maternal grandmother's instructions not to interview the children without an attorney present. *Id.* The interviewed lasted five minutes. *Id.* at 1150. The Plaintiff in *Dees* brought a Fourteenth Amendment familial association claim against the County and a part of the claim was based on an alleged seizure of the child in violation of the Fourth Amendment during the interview by the social worker. *Id.* at 1151. That claim went to trial and the jury returned a verdict in favor of the County, but the district court granted a new trial on the Plaintiff's motion, and granted judgement as a matter of law, finding that there was an unreasonable seizure of the child during the interview. *Id.* The Ninth Circuit reversed the district court's ruling finding that the parent had not actually lost control over the child based on the temporary separation during the interview. *Id.* at 1153.

Unlike *Capp* and *Dees*, here the complaint alleges that Daniels was threatened with removal of Baby S from her care and only after the threat did Daniels agree to the custody plan. FAC ¶ 29. Further, the complaint alleges that Sawyer interfered with

Plaintiffs rights of care, management, and control of Baby S. FAC ¶ 46. The complaint alleges that Baby S was removed from Plaintiffs care and placed with a relative. FAC ¶ 28. Daniels was not allowed to have unsupervised visits with Baby S and was not able to decide the care or treatment of Baby S. FAC ¶¶ 28-29. At this stage of the case, drawing all inferences in Plaintiffs' favor, the allegations in the complaint sufficiently allege that Plaintiffs did indeed lose custody and control of Baby S from December 10, 2021, to January 18, 2022.

Defendants then argue that the correct standard to assess a violation for deprivation of familial association is whether defendants' conduct "shocked the conscience," and Plaintiffs argue the correct standard is actually "unwarranted interference." The correct legal standard to assess a violation for deprivation of familial association is government action that is "so egregious or ill-conceived that it shocks the conscious." *Alberici v. County of Los Angeles*, 2013 WL 5573045, *17, No. CV 12-10511-JFW (VBKx) (C.D. Cal. Oct. 9, 2013). In *Porter*, the Ninth Circuit found that "deliberate indifference" is a subset of "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (The "same standard applies to all due process right to familial association claims, whether the actions that caused the alleged violation were taken by a law enforcement officer, or a social worker."); *See Kulya v. City & County of San Francisco*, 2008 WL 4415116 (N.D. Cal. Sept. 26, 2008) (finding that in order for a social worker's continued detention to violate plaintiff's rights the conduct must be so offensive and intentional as to "shock the conscience"); *See Rosenbaum v. Washoe County*, 663 F.3d 1071 (2011) (finding that to amount to a violation of the right to family integrity, the harmful conduct must "shock [] the conscience" or "offend the community's sense of fair play and decency."); *See Capp*, 940 F.3d at 1060 (finding that "[o]fficial conduct that 'shocks the conscience' in depriving parents of [a relationship with their children] is cognizable as a violation of due process," right to familial association claim under First and Fourteenth Amendment). A Plaintiff can satisfy the "shocks the conscience" standard either by (1) showing that a state official acted with "deliberate indifference," or (2) showing that a

state official "acted with a purpose to harm." *Neil Through Cyprian v. Modesto City Schools District*, 2017 WL 4652744 at *5, No. 1:17-cv-0256-LJO-SKO (E.D. Cal. Oct. 17, 2017).

Next, the question is whether there was reasonable cause to believe Baby S was in imminent danger of serious bodily injury and whether the scope of the intrusion was reasonably necessary to limit that specific injury? Admittedly, the facts in the complaint are very close to support the arguments of both parties in this case. Conducing an analysis under the "shocks the conscience" standard, the Court reviews the information available to Sawyer on December 10, 2021, when Baby S was removed from Plaintiffs' home.

Sawyer received notice of an "inflicted injury" of a two-month-old nonverbal child that was solely in the custody and care of Plaintiffs. FAC ¶ 25. Daniels brought the two "red spots" to Dr. Khan's attention during his pediatrician visit as the doctor did not notice the spots beforehand. FAC ¶ 20. Daniels contacted Dr. Khan on December 8, 2021, to follow-up on the "red spots." FAC ¶ 21. On December 10, 2021, Daniels took Baby S to the Kaiser lab for blood work/testing as referred by Dr. Khan. FAC ¶ 23. During Sawyer's initial physical examination, Baby S did not have a bruise on his face, toes or bottom of his foot as was reported just three days earlier. FAC ¶ 25. Sawyer stated to Daniels that she saw nothing corroborating the pediatrician's report. *Id*. Sawyer also confirmed that the suspected bruises on Baby S's face was a birthmark and there were no bruises on the bottom of Baby S's foot. *Id*. At Rady's Children Hospital, all the examinations, x-rays and tests confirmed that Baby S was healthy and normal with no physical signs to support any claim of abuse or inflicted injury. FAC ¶ 27. Based solely on the allegations in the complaint and drawing all inferences in favor of the Plaintiffs at this stage of the case, there was insufficient reasonable cause to believe Baby S was in imminent danger of serious bodily injury and that removal from the home was necessary at that time. Plaintiffs set forth sufficient facts to support a claim for violation of Plaintiffs' First and Fourteenth Amendment rights.

As to whether the right was clearly established or not, as discussed above, *Wallis* clearly establishes the standard for removal of child absent judicial authorization. Based solely on the facts alleged in the complaint construed in favor of Plaintiffs, a reasonable official in Sawyer's position would know the available information was insufficient to establish reasonable cause to believe that Baby S was in imminent danger of serious bodily injury, or that it was necessary to separate him from his parents. Thus, the operative complaint alleges facts that allow the Court to draw the reasonable inference that Sawyer is liable for the misconduct alleged and she is not entitled to qualified immunity at this time.

### (2) Interview of Daughter at School

In the first cause of action, Plaintiffs also allege that Sawyer's interview of their daughter at school without parental consent or authorization violated Plaintiffs' rights of control and management over their children. Sawyer argues that she is entitled to qualified immunity for any alleged violation of a constitutional right in relation to the interview of Plaintiffs' daughter at school. Plaintiffs do not address this argument in their opposition, appearing to concede the issue. Nevertheless, Sawyer is correct.

Plaintiffs are obviously upset their daughter was interviewed without their consent or authorization during the investigation by Sawyer, however, the right of minor children to be free from unconstitutional seizures and interrogations by social workers has not been clearly established. *See Capp*, 940 F.3d at 1059-60. Therefore, Sawyer is entitled to qualified immunity to any alleged First or Fourteenth Amendment violation relating to the interview of Plaintiffs' daughter at school.

### b. Second Cause of Action

In the second cause of action, Plaintiffs allege Sawyer violated their rights by conducting "forensic medical examinations" without consent or a court order. FAC ¶ 53. Specifically, Plaintiffs allege the initial physical examination by Sawyer on December 10, 2021, the medical examination at Rady's Children's Hospital on December 10, 2021, the medical examination on December 15, 2021, and the medical examination on

December 28, 2021, were without consent in violation of Plaintiff's right to familial association.

The right to familial association includes the right of parents to make important medical decisions for their children, and of children to have those decision made by their parents rather than the state. *Wallis*, 202 F.3d at 1141. "[I]n the absence of parental consent, [physical examinations] of their child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances." *Id.* (quoting *van Emrik v. Chemung County Dept. of Social Servs.*, 911 F.2d 863, 867 (2d Cir. 1990)). Parents have a due process right to notice and consent that is not dependent on the particular procedures involved in the examination or whether the procedure is invasive. *Mann v. County of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018) *See Mueller v. Auker*, 700 F.3d 1180, 1187 (9th Cir. 2012) ("[P]arents have a 'constitutionally protected right to the care and custody of their children' and cannot be 'summarily deprived of that custody without notice and a hearing,' except where 'the children are in imminent danger.'") (quoting *Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997)).

The right of parental consent to conduct a medical examination absent judicial authorization is a defined constitutional right. Here, it is without dispute that there was no warrant issued by a judicial officer.

**(1) December 10, 2021, Exam by Sawyer at Plaintiffs' Home**

Regarding the first physical examination of Baby S by Sawyer on December 10, 2021, at Plaintiffs' home, Sawyer had received a complaint from Dr. Khan that two-month-old Baby S had red spots on the bottom of his right foot and a bruise on his face and bruises between his toes and bottom of his foot resulting from an inflicted injury. Although Plaintiffs refer to Sawyer's physical examination as a forensic examination, there are no specific allegations that Sawyer did anything but a visual and physical

examination. There are no allegations that she used any medical instruments or conducted any medical tests. Further, Plaintiffs do not allege that they denied consent to the examination. A reasonable social worker when confronted with reports of inflicted abuse of a two-month-old baby would not believe that her conduct would be unlawful in that situation. In fact, it appears that Sawyer acted diligently, investigating to determine the cause of injury to Baby S. For this reason, the Court finds the law was not clearly established at the time Sawyer investigated a reported inflicted injury on Baby S. The Court finds Sawyer is entitled to qualified immunity for the physical examination of Baby S on December 10, 2021, at Plaintiffs' home.

### (2) December 10, 2021, Medical Exam at Rady's Children Hospital

Next, is the December 10, 2021, medical examination at Rady's Children Hospital. As stated above, Sawyer received a report of an inflicted injury on two-month-old Baby S and after conducting a visual and physical examination, Sawyer requested a medical examination of Baby S and told Daniels to take Baby S to the hospital for an examination. FAC ¶¶ 25-26. Once again, Plaintiffs do not allege that they denied consent to the examination. In their Opposition, Plaintiffs allege that they were "forced to go along with Sawyer's orders under the threat that a failure to allow the examinations would lead to Baby S being placed in a foster home." ECF No. at 14. However, the paragraphs from the FAC referenced in the opposition, paragraphs 27-33, state that:

> At the conclusion of [the] … day, Ms. Daniels found herself being charged with allegations that Baby S., when presented to Dr. Khan on December 7, had bruising and an 'inflicted injury.' Ms. Daniels was told that the baby could not return home with her and that she could not be alone with her baby … as an accommodation, she would be permitted to have a family member come, get clearance to supervise the baby and pick up the baby from the hospital to take to the family member's residence and serve as the caregiver for Baby S. … Although Ms. Daniels personally objected to the arrangement, she was coerced and effectively forced to along with the 'plan' due to Sawyer informing her that Defendants had 'other options' if she did not comply and

Ms. Daniels did not want her baby placed into foster care or some other improper and unjustified arrangement.

FAC ¶¶ 28-29. The reasonable inferences drawn from these facts taken in light of the nonmoving party is that Plaintiffs were not forced to take Baby S to the December 10, 2021, medical examination at Rady's Children's Hospital. The reasonable inferences drawn from these facts is that Plaintiffs felt threatened that they would lose custody of Baby S after the December 10, 2021, examination was conducted, not prior to the examination. For this reason, the Court finds the law was not clearly established at the time Sawyer investigated a reported inflicted injury on Baby S. The Court finds Sawyer is entitled to qualified immunity for the December 10, 2021, medical examination at Rady's Children's Hospital.

### (3) December 15 and 28, 2021, Medical Exams

As for the two remaining medical examinations on December 15, 2021, and December 28, 2021, based solely on the facts alleged in the FAC construed in favor of Plaintiffs, there is an allegation that Plaintiffs felt threatened with loss of custody and did not challenge the additional medical examinations. However, the FAC gives very little information regarding the December 15, 2021, examination. The FAC simply states that "Baby S. was taken to the Chadwick Center for further examinations. On the first occasion, on or about December 15, 2021." FAC ¶ 30. The FAC does not explain the type of examination that was conducted, or any procedures involved. If it was a visual examination only no judicial authorization or parental consent is required. *Wallis* clearly applies to physical examinations. The failure to include any information related to that "examination" fails to put the defense on notice and violates Rule 8. For that reason, the Court dismisses any alleged constitutional violations from the December 15, 2021, medical examination for failure to state a claim upon which relief may be granted, with leave to amend.

Sawyer argues that Plaintiffs were provided notice of each of these examinations and that Daniels was in fact present for each of the examinations. Further, Sawyer argues

3:23-cv-00316-JES-BGS

that Plaintiffs did not object to either examination. However, as stated above, there is an inference that Plaintiffs did not object to the examinations because of the insinuation that if they did not acquiesce to the examinations, Baby S would be placed in foster care. FAC ¶¶ 27-33. Sawyer further argues that Plaintiffs have not presented a case directly on point to show that the right at issue here is clearly established. However, the Supreme Court "does not require a case directly on point" to show that a right is clearly established for purposes of qualified immunity. *Salvi v. County of San Diego*, 2019 WL 1671001, No. 18cv1936 DMS (MDD), at *5 (S.D. Cal. April 17, 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). *See Smartwood v. County of San Diego*, 84 F. Supp.3d 1093, 1111 (2014) ("[I]t is not necessary that a case be on 'all fours' with the facts of the instant case. A right is clearly established if 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'") (quoting *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1297).

*Mann* and *Wallis* clearly establish the due process requirement of parental consent for medical examinations absent judicial authorization. At this stage of the proceedings, Plaintiffs are entitled to go forward with their claim relating to the December 28, 2021, medical examination.

The Court's denial of qualified immunity at this stage of the proceedings does not mean this case will proceed to trial. Once an evidentiary record has been developed through discovery, Sawyer will be free to move for summary judgment based on qualified immunity. *See Keates*, 883 F.3d at 1240.

### c.  Third Cause of Action – Judicial Deception

In their third claim, Plaintiffs allege Sawyer and Doe Defendants violated Plaintiffs' rights under the Fourteenth Amendment when they included false or misleading information in their contact notes with the intention that said information be used later in drafting reports to potentially be presented to the juvenile court. Sawyer argues that Plaintiffs have failed to set forth sufficient facts to support this claim, and

even if the claim is sufficiently pleaded, it is subject to dismissal pursuant to the *Rooker*-*Feldman* doctrine and issue preclusion.

To successfully allege a violation of the constitutional right to be free from judicial deception, Plaintiffs must make out a claim that includes (1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision. *Benavidez*, 993 F.3d at 1147. In their opposition to the motion to dismiss, Plaintiffs concede that "[they] do not have facts at this time to allege that any of the false contact notes or other documents were ever actually presented to a court." ECF No. 16 at 14. Based on the lack of sufficient facts in the FAC and Plaintiffs' concession of such, the judicial deception claim is **DISMISSED**.

### d. Punitive Damages

Plaintiffs request punitive damages against Sawyer for the conduct alleged. Sawyer argues that Plaintiffs fail to state a claim for punitive damages because they merely make formulaic recitations of the punitive damages standard by alleging that she "acted intentionally and/or with a conscious and callous disregard for Plaintiffs' constitutional rights." FAC ¶¶ 50, 59, 69.

"[P]unitive damages may be assessed under 42 U.S.C. section 1983 when a defendant's conduct is shown to be motivated by evil motive or intent, or if it involves reckless or callous indifference to the federally protected rights of others." *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002); *See Dang v. Cross*, 422 F.3d 800, 809 (9th Cir. 2005) (Finding oppressive conduct may also be a proper predicate for punitive damages in a civil-rights case. "An act … is oppressive, 'if done in a manner which injures or damages or otherwise violates the rights of another person with unnecessary harshness or severity as by misuse or abuse of authority or power or by taking advantage of some weakness or disability or the misfortunes of another person.'") (quoting *Fountila v. Carter*, 571 F.2d 487, 493 (9th Cir. 1978).

In their response to the motion to dismiss, Plaintiffs cite no legal authority to support their request for punitive damages and simply rely on the FAC. The FAC repeats

the alleged actions of Sawyer and Doe Defendants. They are conclusory and are indeed "formulaic recitations" of the punitive damages standard. For that reason, the request for punitive damages is **DISMISSED** with leave to amend.

### B. County's Motion

The County's motion is directed to Plaintiffs' *Monell* claim in the fourth cause of action. On Plaintiffs' *Monell* claim, the County argues it is entitled to dismissal of this claim for several reasons. First, it asserts that Sawyer did not violate Plaintiffs' constitutional rights. Second, the County contends Plaintiffs failed to identify a formal policy or longstanding custom or practice. To the extent Plaintiffs have cited a policy, custom or practice, the County argues Plaintiffs have failed to allege any policy, custom or practice caused any violation of Plaintiffs' constitutional rights. Finally, the County asserts Plaintiffs have failed to set forth sufficient facts to support a *Monell* claim based on failure to train.

"A valid claim of municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 … (1978) requires a showing that the individual's constitutional violation 'implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by [the municipality's] officers'" *Palmerin v. City of Riverside*, 794 F.2d 1409, 1415 (9th Cir. 1986).

To sustain their *Monell* claim, Plaintiffs must show that the action that caused their constitutional injury was part of an "official municipal policy of some nature." *Scanlon v. County of Los Angeles*, 92 F.4th 781, 811 (9th Cir. 2024) (citing *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 793 (9th Cir. 2016) (quoting *Monell*, 436 U.S. at 691). The Ninth Circuit has identified four criteria for a *Monell* claim, "(1) [The Parents] had a constitutional right of which [they] were deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to [their] constitutional right; and (4) 'the policy is the moving force behind the constitutional violation.'" *Scanlon*, 92 F.4th at 811 (citing *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021)) (quoting *Dougherty*

*v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). Further, the Ninth Circuit has also observed three ways a plaintiff can satisfy *Monell*'s policy requirement: The municipal government acts pursuant to an express official policy, the government maintains a longstanding practice or custom, or the act was committed or ratified by an official with policy-making authority. *Scanlon*, 92 F.4th at 811-812 (citing *Gordon*, 6 F.4th at 973-974).

The County's first argument does not warrant dismissal of Plaintiffs' *Monell* claim because, as discussed above, the Court disagrees that Plaintiffs have failed to allege a violation of their constitutional rights in the first and second claim.

The County's second and third argument have merit. The FAC does not spell out any express official policy or longstanding custom or practice. Further, the FAC does not spell out that the act was committed or ratified by an official with policy-making authority. Rather, the FAC makes conclusory allegations that the County promulgated unconstitutional policies and procedures which authorized the conduct in this case. In the Opposition, Plaintiffs fail to address this argument and instead argue the FAC adequately alleges various County policies, customs and practices based on the County's arguments and cited cases in the motion to dismiss. Further, Plaintiffs argue they will be able to provide further detail of the County's customs and practices after conducting discovery. Plaintiffs cannot rely on the County's argument to support an absence of proof in their operative complaint. Before Plaintiffs can proceed to discovery, they must adequately allege a sufficient *Monell* claim in the operative complaint.

The allegations in the FAC do not suffice to state a claim for *Monell* liability. *See Capp*, 940 F.3d at 1061 (finding the FAC ascribes Defendants' alleged misconduct to official policy in a conclusory fashion that is insufficient to state a viable claim.); *See Dougherty*, 654 F.3d at 900 (dismissing "*Monell* and supervisory liability claims [that] lack[ed] any factual allegations that would separate them from the 'formulaic recitation of a cause of action's elements' deemed insufficient by *Twombly*") (quoting *Twombly*, 550 U.S. at 555). A court is "not bound to accept as true a legal conclusion couched as a

factual allegation." *Keates*, 883 F.3d at 1243 (citing *Iqbal*, 556 U.S. at 678) (quoting *Twombly*, 550 U.S. at 555). Thus, the County's motion to dismiss Plaintiffs' *Monell* claim is **GRANTED** in its entirety for failure to state a claim.

Since the Court will grant Plaintiffs leave to amend the complaint, the Court will address the County's fourth argument. It appears Plaintiffs are alleging a *Monell* claim based on failure to train. FAC ¶¶ . "[A]s to a municipality, 'the inadequacy of police training may serve as the basis for 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Flores v. County of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). This means Plaintiffs "'must demonstrate a conscious or deliberate choice on the part of a municipality in order to prevail on a failure to train claim.'" *Id.* (quoting *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008)) (internal quotation marks omitted). "Under this standard, [Plaintiffs] must allege acts to show that the County 'disregarded the known or obvious consequence that a particular omission in their training program would cause [municipal] employees to violate citizens' constitutional rights.'" *Id.* at 1159 (quoting *Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1360 (2011)). In the failure to train context, additional instances of misconduct are usually required to show deliberate indifference, however, a narrow range of possibilities exist where the need for training is so "obvious" as to be satisfied by a single incident. *Connick*, 563 U.S. at 64. Here, as stated above, Plaintiffs have only alleged formulaic conclusory allegations that appear to be based solely on the facts of this incident. Considering these allegations, the County's motion to dismiss Plaintiffs' Monell claim based on failure to train is also **GRANTED**.

## IV.   CONCLUSION

For the reasons set out above, the Court grants in part and denies in part Defendant's motion to dismiss. Specifically, the Court:

(1) **DENIES** Sawyer's motion to dismiss the first cause of action based on the alleged seizure and removal of Baby S from Plaintiffs' custody, care, management and control;

(2) **GRANTS** Sawyer's motion to dismiss the first cause of action based on Sawyer's interview of Plaintiffs' daughter at school;

(3) **GRANTS** Sawyer's motion to dismiss the second cause of action based on both medical examinations on December 10, 2021, including the physical examination at Plaintiffs' home and the medical examination at Rady's Children's Hospital;

(4) **GRANTS** Sawyer's motion to dismiss the second cause of action based on the December 15, 2021, medical examination;

(5) **DENIES** Sawyer's motion to dismiss the second cause of action based on the December 28, 2021, medical examination;

(6) **GRANTS** Sawyer's motion to dismiss the third cause of action;

(7) **GRANTS** Sawyer's motion to dismiss punitive damages; and

(8) **GRANTS** the County's motion to dismiss the fourth cause of action.

Plaintiffs are granted leave to file a Second Amended Complaint that cures the pleading deficiencies set out above with respect to the second and fourth causes of action as well as the request for punitive damages. If Plaintiffs wish to amend any of their claims consistent with this Order, they shall file a Second Amended Complaint on or before **April 19, 2024**. If Plaintiffs fail to file a Second Amended Complaint by that date, the case will proceed as to the viable claims alleged in the First Amended Complaint.

**IT IS SO ORDERED.**

Dated:  March 29, 2024

Honorable James E. Simmons Jr.
United States District Judge